MANION, Circuit Judge,
concurring in part, dissenting in part.
I.
Ray filed this habeas action in federal court on February 28, 2007. Opinion at 996-97. The district court denied Ray’s petition and he appealed to this court. This court held that Ray’s clearly established confrontation clause rights were violated when the state court admitted co-actors’ statements through a police detective’s testimony at trial. Ray v. Boatwright, 592 F.3d, 793, 798 (7th Cir.), as amended (Apr. 1, 2010). However, after holding that Ray’s constitutional rights had been violated, this court remanded the case to the district court to allow the district court to determine whether Ray’s habeas petition had been timely filed. The government had argued that Ray’s habeas petition had been filed after the one-year statute of limitations had run, but Ray had claimed in his habeas petition that the statute of limitations had been tolled because he had handed a state court petition to a prison social worker on April 27, 2004 for mailing. This court concluded that because the district court had dismissed Ray’s habeas petition on the merits, before giving the government “an opportunity to answer the petition and develop the rec *1019 ord,” id. at 798-99, remand was required. Specifically, this court explained:
the government has not yet had a chance to challenge whether the documents Ray placed into the record are authentic; whether the state court petition was ever received by prison officials; whether the papers Ray filed were sufficient under state law to petition for post-conviction relief; or whether the individual to whom Ray allegedly gave his petition was a proper prison authority. Accordingly, we remand this case to the district court so that the government may have an opportunity to develop the record on this issue. If, after the record is fully developed, Ray’s petition is determined to be timely, this Court directs the district court to grant the petition for writ of habeas corpus unless the State chooses to retry Ray within 120 days.
Id. at 799.
On remand, the district court followed our directive. He held an evidentiary hearing at which Ray testified, along with three state employees (two from the prison library and another involved with prisoner accounts). The documentary evidence Ray presented in support of his claims of timeliness was admitted into evidence, as were prison policies from Diamondback. Following the evidentiary hearing, based on the testimony and documentary evidence, the district court concluded, as a factual matter, that the documents Ray presented were not genuine and that his testimony was not credible. The district court further found that Ray had not given Smith a state post-conviction motion on April 27, 2004 for mailing.
Notwithstanding that the district court did exactly what we directed, the court today holds that the district court’s credibility finding and its finding that Ray did not give the motion to a social worker on April 27, 2004 were clearly erroneous. Opinion at 1017. I disagree; the district court’s factual findings, far from being clearly erroneous, were compelled by contradictions and implausibilities in Ray’s story and the documentary evidence. Moreover, while I agree the prison mailbox rule applies (and thus I concur in Part II. A of the opinion), I disagree that the state bore the burden of proving that Ray had not given the purported state post-conviction motion to a social worker on April 27, 2004. However, contrary to the court’s conclusion that “after an evidentiary hearing, the district court placed the burden of proving timeliness on Ray,” Opinion at 995, the district court did in fact place the burden of proof on the state and then concluded that the state had met its burden. And that finding was not clearly erroneous. Accordingly, I concur in part and dissent in part.
II.
A. Ray bears the burden of proving tolling.
I agree that the state bears the burden of proving the affirmative defense of the statute of limitations. Gildon v. Bowen, 384 F.3d 883, 886 (7th Cir.2004). But the state met this burden. The state established that Ray did not file his federal habeas petition until February 28, 2007, and that this filing was not within the one-year statute of limitations because Ray’s state conviction became final on or about September 10, 2003. The state further established that Ray had not filed a state post-conviction petition, which could toll the statute of limitations, until October 2007. Thus, the state proved that Ray’s habeas petition was untimely.
It is Ray who is asserting an exception to the statute of limitations and it is he who should bear the burden of proving *1020 tolling. While this circuit has yet to address the issue of the burden of proof for tolling under 28 U.S.C. § 2244(d)(2), we have held that the habeas petitioner bears the burden of proving equitable tolling. Williams v. Buss, 538 F.3d 683, 685 (7th Cir.2008). That this case involves statutory tolling and not equitable tolling is of no moment — the same principles apply: The party asserting an exception to the statute of limitations’ affirmative defense bears the burden of proving that exception. See also Zepeda v. Walker, 581 F.3d 1013, 1019 (9th Cir.2009)(stating that the habeas petitioner “bears the burden of demonstrating that the AEDPA limitation period was sufficiently tolled” under § 2244(d)(2)).
In holding that the state bears the burden of proving tolling, the court reasons that “ ‘all else being equal, the burden [of proof] is better placed on the party with easier access to relevant information.’ E.g., Nat’l Commc’ns Ass’n Inc. v. AT&T Corp., 238 F.3d 124, 130 (2d Cir.2001).” Opinion at 1008. But the court’s analysis ignores the remainder of what Nat’l Commc’ns said: “The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim.” Id. And “all else again being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a negative.” Id. In this case, it is Ray who is asserting the affirmative of an issue, namely that he gave Smith a state post-conviction motion on April 27, 2004. The court is thus placing on the state the more difficult task of proving a negative — that Ray did not give Smith the post-conviction motion. Finally, I would note that proving the negative in this context is even more difficult because Ray claims he handed the petition to Smith in violation of the prison policy which stated: “All inmate mail will be processed through the institutional mail-room. No person, either staff or visitors, is permitted to bring in or take out any mail or article for an inmate.” [1] Opinion at 1000. No one has been able to find Smith, but if she was part of the prison staff, she would have known she was not permitted to handle prison mail. For these reasons, I dissent from the court’s holding that the state bore the burden of proving the statute of limitations was not tolled.
B. The district court held that the State bore the burden of proof.
After concluding that the state bore the burden of proof, the court concludes that the district court wrongly placed the burden of proof on Ray. Opinion at 1017. However, the district court’s holding on *1021 the burden of proof is actually consistent with the court’s holding today. The district court did hold that the state did not initially carry the burden of proof on tolling. However, the district court also explained that a prisoner claiming the benefit of the mailbox rule had the “initial burden of presenting a sworn declaration setting forth the requirement of having handled] the prison official the document to be filed with postage prepaid.” The district court then agreed with Ray that at that point the burden shifted to the state, stating: “Ray is correct that once the prisoner presents such evidence, as Ray has here, the burden does shift to the respondent to refute it.” The district court, though, recognized that there was a split in the circuits on the burden-shifting approach, between the Ninth Circuit’s decision in Huizar v. Carey, 273 F.3d 1220 (9th Cir.2001) and the Eleventh Circuit’s decision in Allen v. Culliver, 471 F.3d 1196 (11th Cir.2006)(per curiam), but concluded that “regardless of which approach is applied here, the Court finds on the evidence presented that Ray’s petition was not filed within the one-year period allowed under § 2244(d)(1).” Thus, the district court did place the burden on the state and the court is wrong to say that “[t]here is no dispute that the district court placed the burden of proof on Ray.” Opinion at 1017.
C. The district court did not commit clear error in finding that Ray was not credible and in finding that he had not given Smith a state post-conviction motion on April 27, 2004, for mailing.
Even if the state bore the burden of proof, as this court and the district court held, Ray still cannot prevail because, as discussed below, the district court found, following an evidentiary hearing, that Ray’s testimony that he had given a state post-conviction motion to Tamara Smith on April 27, 2004, to mail was not credible. The court holds that the district court committed clear error in finding Ray’s testimony incredible and in finding that Ray had not given the social worker a state post-conviction motion on April 27, 2004, to mail.
As the court notes, we will reverse a district court’s factual findings only if they are “implausible in light of the record viewed in its entirety.” Gorham v. Franzen, 760 F.2d 786, 790 (7th Cir.1985). Moreover, as we recently explained in United States v. Smith, 668 F.3d 427, 430 (7th Cir.2012), “[s]pecial deference is given to the district court’s factual determinations because the district court had the opportunity to hear the testimony and observe the demeanor of witnesses.... ” Thus, because “[d]eterminations of witness credibility are entitled to great deference [they] ‘can virtually never be clear error.’ ” United States v. Cox, 536 F.3d 723, 729 (7th Cir.2008) (quoting United States v. Blalock, 321 F.3d 686, 690 (7th Cir.2003)).
Notwithstanding the extreme deference we owe the district court’s credibility and factual findings, the court concludes that the district court clearly erred. The court justifies its conclusion in four main ways: (1) by stressing all of the evidence the state did not present; (2) by stating that the district court merely branded Ray a liar; (3) by disagreeing with the district court’s reasons for finding Ray and his story not credible; and (4) by positing that the state’s theory that Ray manufactured the evidence is implausible, or at least that there is no evidence in the record for believing Ray manufactured the evidence.
1. Evidence not presented by the state.
I address first the court’s emphasis on the evidence the state did not present. *1022 The court first notes that Smith did not testify, Opinion at 1016, and then adds:
Nor did the state produce any of Diamondback’s former employees to explain if and how the mail policy applied when prisoners were administratively confined, whether receipts were provided for outgoing legal mail, whether prisoners at the facility would have known that they were slated to be transferred to a different prison and the scheduled date of transfer, or whether Ray’s supporting documents were fraudulent. And the Diamondback prison mail logs? Not in the record. None of this evidence is in the record.
Opinion at 1016.
It is true that the state did not present this evidence.[2] But the absence of this evidence is entirely irrelevant to the question of whether the district court was clearly erroneous in finding Ray incredible and his evidence and story contradictory and implausible. Yes, Smith or others from Diamondback might have contradicted Ray’s testimony, but the law does not require direct evidence to prove a fact— circumstantial evidence will suffice.[3] See, e.g., Bloedorn v. Francisco Foods, Inc., 276 F.3d 270 (7th Cir.2001) (“An employer’s motive is a factual matter which, like any other fact, may be proven by direct or circumstantial evidence.”). Moreover, the mail logs the court references, while not produced, would have been completely useless because Ray testified that he did not place the motion in the prison’s regular mail system.
2. “Branding” Ray a liar.
In addition to highlighting the evidence the state did not present, the court reasoned that: “The state prevailed in the district court by branding Ray a sophisticated prison litigant and a liar, without any evidence to support those accusations.” Opinion at 1016-17. That is not so; the district court had ample circumstantial evidence, discussed at length below, to conclude that Ray was both a sophisticated prison litigant and a liar. Thus, contrary to the court’s portrayal, this is not a case of the district court merely branding Ray a liar.
It is true, though, as the Supreme Court has made clear, that a court may not “insulate his findings from review by denominating them credibility determina *1023 tions.... ” Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). But as the Supreme Court further explained in Anderson, there are “factors other than demeanor and inflection [which] go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness’ story; or the story itself may be so internally inconsistent or implausible on [their] face that a reasonable factfinder would not credit [them].” Id. That is exactly what we have in this case and precisely what the district court found. The district court stated: “Taking into consideration all of the surrounding facts and circumstances of this case, the Court does not find Ray’s testimony that he handed his § 974.06 motion to Ms. Smith on April 27, 2004, credible.” The district court further explained it was rejecting Ray’s version of events because of “inconsistencies in his own documentation and further implausibilities concerning that documentation .... ” The district court then detailed a substantial number of inconsistencies and implausibilities, a few of which the court simply mentions without examination or contradiction.
3. The court’s disagreement with the district court’s reasoning.
As noted, the district court detailed a substantial number of the inconsistencies and implausibilities in Ray’s testimony and his evidence. In holding that the district court committed clear error, the court mentions these reasons but then presents its own view of this evidence, substituting its judgment for the district court’s. This is impermissible. United States v. Mancillas, 183 F.3d 682, 695 (7th Cir.1999) (“Factual findings are reviewed for clear error, and this Court will not substitute its judgment for that of the district court if there is support in the record for the trial court’s findings of faet.”)(internal citations omitted).[4]
a. Ray’s impending transfer to Wisconsin.
For instance, in response to the district court’s reasoning that it was curious that Ray gave his Wisconsin state court motion *1024 to Smith in Oklahoma for mailing to Wisconsin when he was about to be transferred to Wisconsin, the court retorts: The state did not present any evidence on “whether prisoners at the facility would have known that they were slated to be transferred to a different prison.... ” Opinion at 1016. But Ray testified: “We was on administrative confinement to the unit. We weren’t — we weren’t allowed to leave the unit.... Because they was bringing Wisconsin prisoners back from Oklahoma back to Wisconsin.” From this testimony, the district court could very reasonably conclude that Ray knew he was returning to Wisconsin while in confinement and that it was strange that he would decide to mail the motion to a Wisconsin court from Oklahoma, especially when he supposedly couldn’t get to the mailbox in Oklahoma.[5]
b. The Certificate of Service form.
Regarding the Certificate of Service form Ray claimed Smith had given him, the district court believed the form looked like the work product of a prisoner, noting: “The certificate bears no signatures, other than Ray’s, and appears on plain white paper with no heading or other indication that it is an official prison form. It contains no space for the year of service, and contains numerous typographical errors.” The court first notes that “no one testified that Ray’s certificate of service was phony.” Opinion at 1014. But as explained above, the state need not prove its case with direct evidence. The court then acknowledges that the form had typos and lacked any institutional markings, but excuses those problems by noting: “[t]he typos in the document, and its lack of any distinguishing characteristics like a letterhead, were consistent with other official CCA documents, of unquestioned authenticity, that Ray introduced into evidence bearing the same defects.” Opinion at 1014. But the district court considered the other forms and found that “[e]ven when compared to other official forms which lack an institutional heading and contain a grammatical error, the court remains convinced that in both form and content the certificate looks more like the work product of a prisoner than a prison administration.” The court rejects this added finding based on its own eyeball comparison of the documents, but here the court is again improperly substituting its own judgment for the district court’s.[6]
*1025 Moreover, in addition to finding that the Certificate of Service looked more like a form created by a prisoner than a prison, the district court also found that Ray’s testimony concerning the Certificate of Service contradicted other documentary evidence. Specifically, Ray testified that Smith had given him the Certificate of Service and that he had filled it out. But as the district court noted, Ray referenced the “Certificate of Service by Mail” form in his supposed first letter to Smith on June 1, 2004, but in that letter he stated that she had filled it out. Ray also mentioned the Certificate of Service form in his “Motion for Protective Order Staying And Abeying [sic] Petitioner’s Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. § 2254,” and there he stated that Smith had signed the form. Ray’s change in story, i.e., from his original claim that Smith had filled out the Certificate of Service form, to his current version that he had filled out the form, is significant. Had he not changed his story, the state could have shown, through handwriting analysis, that Ray had completed the form.[7]
c. Testimony concerning postage.
The state also provided evidence, through the testimony of Highley, calling into question Ray’s story that he gave Smith the state post-conviction motion. She testified that during the time that Ray supposedly gave Smith the state court motion for mailing, he had not purchased any postage. The court responds that the state’s evidence, through testimony of Ms. Highley, that Ray did not purchase postage during April 2004 did not establish that Ray did not provide Smith with the motion because Highley “could not rule out the possibility that Ray had retained postage from earlier purchases, borrowed stamps from other prisoners, or received postage from family members or friends who were not incarcerated.” Opinion at 1015. It is true that during cross-examination Highley testified that she could not rule out that possibility, but it was one piece of evidence the district court could consider in evaluating Ray’s story. And when considered in light of other record evidence, Highley’s testimony supported the district court’s factual findings. Specifically, Ray’s testimony concerning the postage for the state post-conviction motion was inconsistent with other evidence. Before the district court, Ray testified that he used stamps for postage on the state post-conviction motion he purportedly gave Smith, stating he had some and borrowed a few to make sure there was enough postage on it and then gave Smith a disbursement request in case there wasn’t enough postage. However, this testimony was inconsistent with the affidavit Ray had filed in February 2007 with his petition for habeas relief: In that affidavit, Ray stated *1026 that he “personally placed [his] postconviction motion puruant (sic) to 974.0614, (sic) along with disbursement request for postage in the hands of Tamara Smith,.... ” Ray made no mention of having affixed stamps to the envelope. Because Highley’s testimony ruled out the possibility that a disbursement was made for stamps around the time Ray claimed to have given Smith the motion, this change in story (i.e., Ray’s current claim that he had placed stamps on the motion) takes on a greater significance.
d. Diamondback’s policies.
The court also discounts the state’s evidence concerning the mail policies at Diamondback. First, the court reasons that nothing in the record explains whether the Diamondback policy that “[a]ll inmate mail will be processed through the institutional mailroom. No person, either staff or visitors, is permitted to bring in or take out any mail or article for an inmate,” applies to prisoners while administratively confined. Opinion at 1016. But the policy clearly states “[a]ll inmate mail.” Moreover, Ray’s testimony that he gave the motion to Smith because he could not go to the mailroom is implausible in light of his other testimony. Specifically, in explaining how he came to give the motion to Smith, Ray speaks of leaving his lunch table, going upstairs to his cell, bringing the envelope with the motion in it downstairs, and then going into a social worker’s office with her. It is difficult to believe that a prisoner could roam with that much freedom and be able to walk to the social worker’s office, but be unable to walk with the social worker to the centrally located mailbox or the prison mailroom.[8]
The district court also found it “noteworthy that the CCA Corporate and Facility Policy governing Diamondback does not mention either a ‘Privileged Correspondence Receipt’ form or a ‘Certificate of Service By Mail’ form, but it does specify the form to be used when privileged correspondence is distributed to an inmate.” The court counters that while the prison mail policy does not mention the giving of a receipt for outgoing legal mail, the state did not produce Smith or some other prison official to prove that forms were not given. Opinion at 1015. But direct evidence is not required and Diamondback’s policy addressing the handling of privileged correspondence is circumstantial evidence that supports the district court’s factual findings. That policy stated that for incoming privileged correspondence “[a] staff member will distribute privileged correspondence to inmates using form 16-1D.” Conversely, the policy “AT THIS FACILITY” for mailing outgoing privileged correspondence provided that “[a]ll outgoing legal mail is logged in at the mailroom when it is received.” The district court could reasonably infer from the fact that the prison policy specified the use of a form to log incoming privileged mail and its directive that outgoing privileged mail be logged in the mailroom, that Diamondback did not give prisoners a Certificate of Service or a Privileged Correspondence Receipt form upon mailing privileged mail.
e. The Privileged Correspondence Receipt.
The court next attacks the district court’s findings concerning the Privileged Correspondence Receipt. The district *1027 court found that it was doubtful that Ray ever had a Privileged Correspondence Receipt form signed by Smith. In response, the court conclusorily states: “Ray offered an essentially uncontested reason for his failure to produce it: the prison library or mail system lost the document after he gave it to the library staff for copying.” Opinion at 1014. The court then adds that: “The only evidence remotely contradictory was the testimony that this might have been the first time during both Officer Nedbal’s and Ms. Martin’s tenure that a prisoner’s copy request .had been lost. But as Officer Nedbal and Ms. Martin confirmed, the prison would only know if the prisoner reported it to the library staff or some other prison official. So it is certainly possible that Ray’s requested copies were not the first to be lost.” Opinion at 1014. The court continues, saying that even if Ray’s Privileged Correspondence Receipt was the first to be lost, “that fact does not establish an evidentiary basis for finding that Ray manufactured the [Privileged Correspondence Receipt] or fabricated a fictitious tale about it.” Opinion at 1014. The court further reasons that Officer Nedbal and Ms. Martin “testified that prison policy required prisoners to describe in detail the documents they submit for copying and anything ‘suspicious’ would be reviewed by a supervisor,” and that suspicious items included ones where the description did not match its content. But no one flagged Ray’s submission for review. Opinion at 1014. And this testimony “lent further credibility to Ray’s claim that he had, but lost, a CCA receipt signed by Ms. Smith.” Opinion at 1014.
Far from being “essentially uncontested,” the state strenuously challenged Ray’s story and the district court found that “Ray’s evidence that [prison officials] lost his Privileged Correspondence Receipt form [are] unconvincing.” The district court explained that “[b]ased on the testimony, it is clear that the document Ray handed [Corrections Officer] Nedbal for photocopying could have been a document he created in an attempt to manufacture additional evidence to corroborate his claim that he handed his state post-conviction motion to Smith for mailing on April 27, 2004.” The district court further found “[t]he detail in which Ray described the document in the Disbursement Request form suggested a purpose beyond a simple request for a thirty-cent disbursement for photocopying.” And although the form requires “detailed instructions,” the librarian testified that “the detail required concerned the directions for copying, i.e., number of copies, one or two sides, legal or letter size — not the document to be copied.” The district court added: “Library personnel were not expected to determine the authenticity of the documents submitted for copying. They screened the material for appropriateness and to insure it did not relate to a different inmate.” Moreover, prison officials were not allowed to read legal materials — they mainly looked to ensure the name of the inmate matched the document. Based on this testimony, the district court found Ray’s claim that prison officials lost the Privileged Correspondence Receipt unconvincing. This finding was amply supported by the evidence.
In response to the dissent, the court states: “[I]t takes a speculative leap to go from the mere fact that Ray described the document in the disbursement request form in a lot of detail to the conclusion that he fabricated it.” Opinion at 1014. The court’s conclusion, though, flows from its misunderstanding of the record. Specifically, the court confuses the Disbursement Request form with the Photocopy Request form. A prisoner requesting a photocopy must complete both forms, but *1028 it is the Photocopy Request form, and not the Disbursement Request form, which must include “detailed instructions as to what is to be copied.” But it was in the Disbursement Request form and not the Photocopy Request form that Ray described in excruciating detail the purported Privileged Correspondence Receipt, stating:
TWO COPIES OF A CORRECTIONS CORPORATION OF AMERICA PRIVILEGED CORRESPONDENCE RECEIPT FORM SIGNED BY CCA SOCIAL WORKER SMITH, REGARDING MY PLACING MY 974.06 MOTION IN HER HANDS APRIL 27, 2004.
And Ray typed that detailed description of the content of the purported Privileged Correspondence Receipt form in the blank entitled: “Reason for Request.” The Disbursement Request form also required prisoners to state the “Individual Items Requested,” and here Ray merely typed “2 Copies of CCA Form.” Then in the Photocopy Request form, Ray described the form simply as: “2 copies of a CCA Mail Form Receipt/Please’ send the copies I have requested to me through the institutional mail. Thank you.”
That Ray included such detail (including that the purported Privileged Correspondence Receipt form was signed by Smith and stated that he placed the state court motion in her hands on April 27, 2004), in the Disbursement Request form when the form merely asked for the “Reason for Request,” and not in the Photocopy Request form, is significant for two reasons. First, and as the district court found, there is no reason to provide such detail in the Disbursement Request which merely served to request a thirty-cent disbursement for photocopying. Second, while the librarian was responsible for reviewing the Photocopy Request form to ensure it was filled out correctly and to screen materials for copying for appropriateness, no similar review of the Disbursement Request form was required; rather, according to the library procedures (contained in the record), the librarian’s responsibility was merely to authorize the Disbursement Request form indicating the correct amount charged and then route it appropriately. Officer Nedbal and Librarian Martin’s testimony at the evidentiary hearing confirmed these facts. And Officer Nedbal, who approved the Disbursement Request form, said he merely “glanced'at” the “Reason for Request.” Later, when the librarian screened the document Ray submitted for copying, the librarian would compare that document to the general description, i.e., “CCA Mail Form Receipt,” Ray put in the Photocopy Request form. Moreover, as Librarian Martin further testified, while she would merely be scanning the document and description contained in the Photocopy Request form, “[t]he person making the copies would have to read that in more detail.... ” Ray had previously worked in the library, so he knew how the forms were processed.
The court’s response to this is “the fact that librarians were not required to affirmatively verify the authenticity of documents to be copied does not create a reasonable inference that the document was therefore a fake or nonexistent.” Opinion at 1014. I agree. The mere fact that a librarian was not required to verify the authenticity of the document to be copied does not create an inference that the document was therefore a fake or nonexistent. But this fact does mean that the form submitted for copying might not have been the one described by Ray in the Disbursement Request form.
Then the question is whether the other evidence allows for the reasonable inference that the Privileged Correspondence *1029 Receipt form was nonexistent or fake. And it does: Namely, the fact that Ray included the extensive details of the content of the document to be copied in the Disbursement Request form, but not in the Photocopy Request form, creates a reasonable inference that he did so to invent evidence to support the inference that there had once been in existence a Privileged Correspondence Request form signed by Smith stating that he had given her a state post-conviction motion for mailing in April 2004. This inference is even stronger given that in the Photocopy Request form Ray wrote “ ‘Please’ send the copies I have requested to me through the institutional mail.” There was no reason for Ray to state on the Photocopy Request form that he wanted the form returned to him through the institutional mail system, absent a premeditated plan to create a paper trail to establish that the purported Privileged Correspondence Request form existed and then was “lost in the mail.” First, the Photocopy Request form does not ask the prisoner to specify how he wants the photocopied materials returned. Second, the evidence creates a reasonable inference that the librarian had, in the past, personally handed Ray his completed copies (and thus Ray needed to specify that he wanted the copies returned via institutional mail to avoid that possibility). The librarian knew about Ray’s case and testified “we did lots of copies for Mr. Ray.” Librarian Martin also testified that Ray had personally handed her copy requests in the past and that she usually picked up the completed copies. Ray also testified that, in the past when he had asked Librarian Martin for copies, “she screen them then she gonna make — she gonna make them, yes.” Third, Ray testified that once he got his hands on the Privileged Correspondence Receipt form, his first thought was to make a copy of the document and after it was supposedly lost, he explained how important the copy was. Yet, according to the record, Ray gave Officer Nedbal the Privileged Correspondence Receipt form, Disbursement Request form, and Photocopy Request form on April 18, 2010, which was a Sunday. Besides the fact that there is no mail delivery on Sunday (and thus Ray did not immediately request a copy of it), Librarian Martin did not work on Sundays and because she needed to screen the copy requests, Ray’s paperwork would need to be held until Monday when she returned. And Ray had worked in the library and he testified at length about some of the procedures related to copy requests, so he knew full well how things would be processed.[9] Thus under Ray’s version of things, he handed over possession of this extremely crucial document to Officer Nedbal so that it could be left sitting in a basket behind the library desk, as opposed to handing it personally to Librarian Martin and waiting for the copy to be made and handed back to him. And then, even though Ray recognized the importance of the purported Privileged Correspondence Receipt form, he wrote on the Photocopy Request form “ ‘Please’ send the copies I have requested to me through the institutional mail.” Given the importance Ray claimed for the purported document, it is reasonable to infer that Ray took the purported Privileged Correspondence Receipt form to the library on a Sunday because he knew that Librarian Martin was not there and couldn’t ask him about the form[10] or have *1030 the copy made for him while he waited; and that he requested the copies to be sent via institutional mail so that he could claim it was lost in the mail. These inferences are further strengthened when Ray’s response to the purported missing Privileged Correspondence Receipt form is considered: Ray filed an Information Request form seeking information about the supposed missing form, noting that Nedbal signed the Disbursement Form and Photocopy Request form “verifying that the document I placed in his hands matched what I wrote on those forms.” Ray later wrote the warden asking “for my original copy of the CCA form to be found and returned to me as soon as possible or be provided with a copy of the memo that Mr. Lines sent to staff about this matter, so I could forward the e-mail to my attorney, so he could prove that the copies alone [sic] with the original copy was some how missed placed [sic] or given to the wrong inmate.” (Emphasis added.) Taken together, all of this evidence adds up to create a very reasonable and natural inference that Ray had written a detailed description in the Disbursement Request form because he knew no one would review the detail contained in that form and then he requested the copies be returned through the prison mail system so that he could feign their disappearance and later use the prison forms as evidence that he had a Privileged Correspondence Receipt form signed by Smith which verified the purported mailing of the April 27, 2004 state post-conviction motion. This conclusion is not a speculative leap, but rather is based on the reasonable inferences flowing from the various pieces of record evidence, which when put together form a pretty clear mosaic showing what happened.
Moreover, it wasn’t just that Ray provided a detailed description of the supposed content of the purported Privileged Correspondence Receipt in the Disbursement Request form. Also Ray’s strange request to have this important form returned through the prison mail system, and then its inexplicable disappearance, create an inference that the form never existed. There are several additional pieces of evidence which, when taken together, further create a reasonable inference that there was no Privileged Correspondence Receipt. In fact, the totality of the evidence makes Ray’s entire story utterly implausible. First, as the district court explained, Ray had never mentioned the Privileged Correspondence Receipt in any of his documentation until April 18, 2010. And that was only after this court had granted his habeas petition on the merits, but remanded to the district court for a determination on whether the petition was timely. Yet Ray had specifically referenced the “Certificate of Service by Mail” form in his first purported letter to Smith on June 1, 2004, and in his “Motion for Protective Order Staying And Abeying [sic] Petitioner’s Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. § 2254,” which he filed with his habeas petition on February 28, 2007. Ray even noted in bold that he had attached a copy of the Certificate of Service to his motion (and stated that it was signed by Smith). Ray also attached copies of the three letters he claims he sent to Smith asking her to confirm that she had mailed his motion to the state court. The district court aptly stated the absurdity of this: “Yet, he failed to even reference the one document [the Privileged Correspondence Receipt] which *1031 supposedly corroborated his account that bore someone’s signature other than his own.” The district court reasonably inferred from the evidence that because Ray knew the importance of mentioning the Certificate of Service by Mail form in the court filings, he surely would have also mentioned the Privileged Correspondence Receipt if one had truly existed.[11]
There is more, though. The district court also found that Ray’s explanation for his failure to mention the “Privileged Correspondence Receipt” form earlier is inconsistent and not plausible. The district court explained that Ray had “testified that another inmate who was helping him had it in his possession when he was transferred to a different institution, and it wasn’t until later (he’s not sure when) that it was returned to him.” And Ray claimed he did not understand federal habeas law or the significance of the form, but Ray was well-versed in legal proceedings. The district court added that the fact that Ray “noted in bold in a motion filed contemporaneously with his petition that the ‘Certificate of Service’ was signed by ‘Tamara Smith,’ shows that he knew the importance of a document signed by someone on the prison staff.” And even if one accepts his testimony that he allowed one of his inmate helpers who was later transferred to a different institution to retain possession of such a crucial document, nothing prevented him from at least mentioning it in one of his previous filings.
Ray’s failure to mention the Privileged Correspondence Receipt form until after this court remanded the case to the district court is extremely suspect. But Ray’s excuse for not mentioning it earlier presents an even greater implausibility in Ray’s entire story than the district court recognized. Here, the district court misread the record when it stated that Ray had testified “that another inmate who was helping him had it in his possession when he was transferred to a different institution, and it wasn’t until later (he’s not sure when) that it was returned to him.” Actually, Ray testified on direct examination, under questioning from his own attorney, that once the Seventh Circuit’s opinion came down in April, he “started trying to reach out trying to find the inmate who was transferred from the institution with my receipt.” Ray further testified: “I was *1032 trying to get a copy for me and to mail you the original.” So, even though Ray was now represented by very competent attorneys, we are supposed to believe that after reading the April 1, 2010 opinion, he took it upon himself to track down the form. Ray’s attorney even acknowledged he was out of the loop, stating in his closing argument that “quite frankly, when I found out what had happened [with the Privileged Correspondence Receipt] I was livid because I would have driven to Wisconsin myself to pick that form up and provide it to the Court.”[12]
The absurdity is even more obvious when the timing of everything is considered. Ray testified that the prisoner was transferred to another prison with the Privileged Correspondence Receipt form while helping Ray with his habeas petition, and that he (Ray) did not have the Privileged Correspondence Receipt at the time that he filed his habeas petition. Ray filed the habeas petition in February 2007, which means that under Ray’s version of events, he lost possession of the form sometime before February 27, 2007. It was April of 2010-more than three years later — when Ray “started trying to reach out trying to find the inmate.” Even if Ray began that search immediately (Thursday, April 1, 2010), that would have given Ray only 18 days to get the Privileged Correspondence Receipt back, since Ray supposedly dropped it off for copying on Sunday, April 18, 2010. Within those eighteen days, then, we are supposed to believe that Ray was first able to track down the other prisoner, even though that prisoner had been transferred more than three years previously. That by itself would be a challenge given that in the two years surrounding Ray’s litigation, Ray himself was transferred to five different prisons.[13] And remember Ray was the one “reaching out” — he didn’t say that he asked his top-notch attorneys for help, and if his attorneys were the ones tracking down the former prisoner, they never would have suggested that the form be mailed to Ray who was still in prison. Then Ray would have us believe that he was able to communicate with that prisoner; and that that prisoner still had a copy of his Privileged Correspondence Receipt from more than three years ago. And we are to further believe that that prisoner was able to send the document to Ray— leaving one prison and thus undergoing the delay caused by any screening procedures — and then be received at Ray’s prison, clear screening and be delivered to Ray. All of this in eighteen days, which *1033 included three weekends.[14] And then the prison conveniently lost it! This story is utterly unbelievable.
f. Ray’s knowledge of habeas law.
The final aspect of the district court’s reasoning that the court attacks is the district court’s finding that Ray’s assertion that he did not understand the law governing habeas corpus is not plausible. The court reasons that there was no evidence to support the district court’s branding Ray a sophisticated prison litigant. Opinion at 1016-17. The court first criticizes the district court’s statement that Ray had two or three boxes of legal materials when he was at Diamondback. The court then rhetorically asks: “Were these small shoe boxes or large moving boxes? Were they filled with distinct documents or multiple drafts or copies of only a handful unique ones?” before concluding “[t]he record does not say.” Opinion at 1015.
The court, though, gives short shrift to the district court’s other reason for rejecting Ray’s claim that he did not understand the law governing habeas corpus. Ray had testified before the district court that when he wrote the state court on October 4, 2006, to inquire on the status of the post-conviction motion, he knew nothing about federal habeas law and had talked to no one about it. The district court explained that “Ray’s initial filing in the district court came less than six months- after he claims he first became aware that his original state post-conviction motion was not filed in state court and that filing demonstrates his ‘detailed knowledge of not only the one-year limitation period for federal habeas petitions, but also the mailbox rule and the rules governing tolling of the one-year period.’ ”
In fact, though, the record is even more damning than what the district court found. While Ray filed his habeas petition in February 2007, Ray dated the signature line of the pro se Petition for Protective Order Staying and Abeying (sic) Petitioner’s Writ of Habeas Corpus, which accompanied his habeas petition, November 27. (And since Ray filed the Petition in February 2007, November 27 must be November 27, 2006.) Ray signed that document less than two months after he sent the letter to the state court inquiring about his supposed missing post-conviction motion. In Ray’s pro se Petition for Protective Order Staying and Abeying (sic) Petitioner’s Writ of Habeas Corpus, Ray demonstrated his extensive knowledge of habeas law, including the one-year statute of limitations, the mailbox rule, and tolling principles. (Attached as Appendix E is that pro se petition so that there is no question of the depth of Ray’s knowledge.) Thus Ray clearly knew the importance of showing that he had given the state post-conviction *1034 motion to Smith for mailing on April 27, 2004, around the time he wrote to the Wisconsin state court. Given Ray’s detailed knowledge of habeas law in November 2006, it is reasonable to infer that Ray had similarly detailed knowledge in October 2006, at the time he wrote the state court to supposedly inquire about the status of his state court petition.[15]
4. The state’s theory that Ray manufactured evidence.
The court’s last main rationale for rejecting the district court’s factual findings seems to be its view that the only way to find Ray’s testimony not credible is to believe that Ray “concoet[ed] a sophisticated scheme in October 2006 to assert a mailbox rule claim and avert AEDPA’s one-year time bar.” Opinion at 1016. The court reiterates that view later, stating: “The state’s argument requires us to believe that Ray knew in 2004 that the mailbox rule would apply to a section 974.06 post-conviction motion filed in Wisconsin, even when the motion is not received by the state court — issues that we decide today as a matter of first impression.” Opinion at 1017.
The state’s theory requires nothing of the sort. Rather, all we need to believe is that on October 4, 2006, Ray knew that he could not pursue habeas relief unless he had given a state post-conviction motion to a prison official within the one-year statute of limitations.[16] And Ray undisputedly had that knowledge on November 27, because that is the date on the signature line of his signed pro se “Motion for Protective Order Staying And Abeying [sic] Petitioner’s Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. § 2254.”[17] *1035 Everything else could have easily been back-filled: Ray could have created the letters he claimed to have mailed to Smith, as well as the Certificate of Service, and then merely dated them 2004. Similarly, it wouldn’t take much to come up with the idea of pretending the prison lost a “Privileged Correspondence Receipt” during copying.
Moreover, contrary to the court’s conclusion that “without evidence there is no basis for believing” Ray concocted a scheme to avoid the statute of limitations, there is ample circumstantial evidence that Ray invented the April 27, 2004, mailing and the “loss” of the “Privileged Correspondence Receipt.” Much of this evidence was discussed above. But there is still more. For instance, the only document Ray had notarized was the October 4, 2006, letter he sent to the Wisconsin state court inquiring on the status of the motion he supposedly gave Smith in April 2004. When asked why he notarized the letter, he said “Because it’s a court document — it’s going to the court. It’s like a court document.” But this was merely a letter and he wanted it notarized. Yet he didn’t attempt to have the state post-conviction motion notarized. His explanation makes no sense and the existence of the notary seal on the October 4, 2006 letter to the Wisconsin court shows that Ray was completely aware of the significance of that letter and this supports the factual finding that Ray manufactured documentation to support a non-existent state post-conviction motion.
Additionally, the district court reasoned that Ray’s lack of diligence in following up with the state court clerk about the post-conviction motion he purported to file in April 2004, until October of 2006, also supports the idea that Ray made up the supposed April 27, 2004, motion. I agree. Had Ray truly filed a motion with the state court in April 2004, he would not have waited more than two years to inquire on its status. See Allen, 471 F.3d at 1198 (“The district court may take into account any and all relevant circumstances, including any lack of diligence on the part of Allen in following up in a manner that would be expected of a reasonable person in his circumstances, in deciding whether the notice was delivered to the prison authorities.”).[18] Ray tried to explain away his lack of diligence by saying that he was told by other prisoners not to bother the court. But as the district court also aptly noted, at the very least Ray would have had to contact the state court to let it know he had been transferred.[19] And Ray was transferred not *1036 just once, but four times between the supposed mailing of the motion in April 2004 and the first time Ray contacted the state court to inquire of his petition in October 2006. See supra at 1032 n. 13.
Moreover, the district court found implausible Ray’s claim that he sent three letters to Smith in an effort to confirm she mailed the motion to state court. Besides noting that there was no way to tell from the appearance of the letters whether Ray mailed them, the district court also found it curious that Ray would retain a copy of a letter he supposedly sent to Smith only a month after he handed her his state motion, but did not keep a copy of the motion itself. The district court added that it was also curious that Ray stated in an affidavit that he also wrote Diamondback regarding his lost property on the same dates that appear on his letters to Smith, but Ray couldn’t remember if he kept a copy of those letters. The district court was right that these inconsistencies all rendered Ray’s story questionable. It is also unbelievable that even though Ray heard nothing from Smith in response to his purported June 1, 2004, letter, he would continue to write to her on September 9, 2004, and then even after he had not heard anything from Smith for over a year, he wrote to her a third time on June 15, 2005. And, then, after writing to the state court and supposedly learning for the first time that the motion was not filed, Ray claimed again that he wrote to Smith — from whom, under his version of events, he had never received a response — and also the prison warden, to find out what happened to his petition.[20] It is utterly unbelievable that a prisoner would continue such a letter-writing campaign, absent a desire to give credence to his earlier story that he had given Smith the petition.
In the end, yes, we have to believe that Ray concocted a story — but the evidence taken as a whole overwhelmingly supports, perhaps even compels, that finding. It is also not nearly the sophisticated scheme the court thinks it is and it also didn’t have to start back in 2004, but rather could have been hatched just a few months before Ray turned to federal court for habeas relief.
III.
As noted, the court holds that the district court’s factual findings (that Ray was not credible and that Ray had not given Smith a state post-conviction motion for mailing on April 27, 2004) were clearly erroneous. In reaching this conclusion, though, the court gives only passing mention to many of the inconsistencies and implausibilities in Ray’s story and his supposedly supporting documentation which the district court relied upon to justify its findings. But contrary to the court’s attempts to downplay those inconsistencies and implausibilities, they all did call Ray’s story into question. And two aspects of Ray’s story were so unbelievable that alone they justify the district court’s factual findings: (1) Ray’s claim of ignorance of habeas law on October 4, 2006, when he wrote to the state court, when just the next month he signed a habeas petition that detailed habeas law, the statute of limitations, the prisoner mailbox rule, and *1037 the principle of tolling; and (2) Ray’s claim that he never mentioned the “Privileged Correspondence Receipt” form in his habeas petition or other earlier documentation because the prisoner who had been helping him with his habeas petition had been transferred to another prison with that form and then later that that form was lost. That would require, in eighteen days, Ray (and not his attorneys) to be able to track down the other prisoner who would still have a copy of the form from more than three years, and have the form successfully mailed out of one prison system and delivered into another, and once retrieved, lost in the prison mail.
While I believe these two implausibilities alone are sufficient to affirm the district court’s factual findings, there were many other inconsistencies and implausibilities relied upon by the district court in reaching its finding that Ray was not credible and that Ray had not given a state post-conviction motion to Smith on April 27, 2012. The court downplays or ignores these, but taken together they all demonstrate that the district court’s finding that Ray was not credible and that Ray had not given Smith a state post-conviction motion for mailing on April 27, 2004 was well-supported by the evidence. See, e.g., Anderson, 470 U.S. at 575, 105 S.Ct. 1504 (“Documents or objective evidence may contradict the witness’ story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.”).
I regret consuming everyone’s time in laying out the minutiae of the record. But given the court’s conclusion that the district court committed clear error in finding Ray incredible and in finding that he did not give Smith the state post-conviction motion on April 27, 2004, it is necessary to detail the many, many inconsistencies, contradictions, and omissions in Ray’s story, in addition to highlighting the sheer implausibility of several aspects of Ray’s story in light of the record. As these details show, Ray’s problem with the district court was not that the district court branded him a liar. Rather, Ray’s problem is that the district court reviewed all of the evidence and heard Ray testify in person and after this evidentiary hearing found that he was a liar. This conclusion was not based on improper speculation, but on the totality of the reasonable inferences flowing from the record evidence.[21] A thorough review of the cold record verifies this assessment. But in addition to the record, the district court had the benefit of watching Ray’s demeanor and hearing him try to explain away all of the inconsistencies, vagaries, and implausibilities of his story. Our court should not substitute its judgment for the district court’s and by doing so at such great lengths today it creates dangerous precedent in general, and even more dangerous precedent when the prisoner mailbox rule is at issue and the court shifts *1038 the burden of proof to the state solely on the basis of a prisoner’s affidavit. Therefore, while I concur in the court’s holding that the prisoner mailbox rule applies to Wisconsin post-conviction filings, I dissent from the court’s holding that the state bore the burden of proving Ray had not given Smith a state post-conviction motion for mailing on April 27, 2004, and from its further holding that the district court committed clear error in finding that Ray had not given the motion to Smith.
APPENDIX A
[[Image here]]
*1039 APPENDIX B
[[Image here]]
*1040 APPENDIX C
[[Image here]]
*1041 APPENDIX D
[[Image here]]
*1042 APPENDIX E
[[Image here]]
*1043 [[Image here]]
*1044 [[Image here]]

. The court responds that the more natural reading of this rule is that no one can take mail into or out of the prison. Opinion at 1011. But in addition to specifying that the mail must be processed through the mail-room, the procedures also discuss the "posting of outgoing mail,” stating that: "OUTGOING MAIL WILL BE DELIVERED FROM THE INMATE/RESIDENT TO THE FACILITY BY THE FOLLOWING PROCEDURE: The mail clerk will pick up the mail from the centrally located mail box between 8:00 a.m. and 8:30 a.m. Mail will be delivered to the post office the same day it is received by the mail clerk in the Diamondback Correctional Facility mail room.” The policy reiterates this point stating later: "THE PROCEDURE AT THIS FACILITY FOR COLLECTION OF MAIL IS AS FOLLOWS: Mail will be collected from the centrally located mail box Monday through Friday, (excluding holidays) between 8:00 a.m. and 8:30 a.m.” See also Policy 16-1 ("Outgoing mail will be posted within 24 hours of the time the mail was turned over to the facility by the inmate/resident, ...” (emphasis added)). Taken as a whole, these procedures clarify that prisoners must deliver outgoing mail to the "facility,” and not a staff member, via the centrally located mailbox. No exception is listed for those in administrative confinement even though the policy includes a list of "ADDITIONAL PROCEDURES AT THIS FACILITY” related to mail collection.

. Diamondback has been closed and the state’s attempts to speak with former Diamondback staff have proved futile. Ray's attorney indicated at oral argument that they have not made any efforts to find Smith because it is not their burden. While I disagree with that proposition, see supra at 1019-20, even assuming the state bore the burden of proof, its inability to obtain direct evidence of Ray's fraud does not insulate Ray from a finding that he is not credible.

. The court responds that “the state did not even present circumstantial evidence upon which a factfinder could have reasonably based his doubts about Ray’s testimony.” Opinion at 1016. If the court’s point is that most of the evidence contradicting Ray's testimony came from Ray himself (and not the state), that objection is misplaced. See Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan, 687 F.3d 320, 336-37 (7th Cir.2012) ("We will not disturb the district court’s factual findings after it has weighed the evidence on both sides unless, after considering all of the evidence, this court is left with the definite and firm conviction that a mistake has been made.”)(emphasis added). If, on the other hand, the court believes that the evidence presented at the hearing does not support a reasonable inference that Ray lied about giving Smith a post-conviction motion, the court is wrong. As discussed below, Ray's testimony, the prison officials’ testimony, the Diamondback policies, and the extensive documentation Ray presented to prove his case, taken together created a reasonable inference that Ray never gave Smith a post-conviction motion for filing.

. The court’s response to the dissent illustrates two further flaws in the court's review of the district court’s reasoning: First, the court quotes Anderson out of context to reason (hat (what the court perceives as) minor inconsistencies or implausibilities in Ray's story cannot support the district court’s factual finding because they are not “so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.” Opinion at 1013. But in Anderson, the Supreme Court was not discussing what was required to support a factual finding; rather, the Supreme Court was explaining when a credibility determination could be overturned as clearly erroneous. Had the district court found Ray credible, the evidence might not reach the “so internally inconsistent or implausible on its face” threshold to conclude that the district court committed clear error. But in this case the district court found Ray incredible and thus the court’s reliance on Anderson is misplaced. Second, in concluding that the inconsistencies and implausibilities in Ray’s story and his evidence cannot support the district court’s factual finding, the court isolates each piece of evidence and then one by one concludes that the individual inconsistency or implausibility is insufficient by itself to support the district court’s factual findings. See, e.g., Opinion at 1014-15. However, no one piece of evidence must support a factual finding; rather the court must take the entire record as a whole. Cf. Huff v. UARCO, Inc., 122 F.3d 374, 385 (7th Cir,1997)(discussing standard in a discrimination case). Thus, that individually some of the vagaries are minor is of no moment; the court should have considered all of the inferences flowing from the evidence in total. And in total, the evidence was more than sufficient to support the district court's factual findings that Ray was not credible and that Ray had not given a state post-conviction motion to Smith to mail.

. The court responds that any normal prisoner would want to file such a critical motion without delay, to avoid any delay in his potential release from prison. Opinion at 1016-17. If such an inference is reasonable, then it is even more reasonable for the district court to have inferred that had Ray truly filed a motion with the state court in April 2004, he would not have waited more than two years to inquire on its status.

. Because the court relies on its own eyeball comparison of the two documents to reject the district court’s findings, attached as Appendix A is a copy of the Certificate of Service form Ray claims he received from Smith. This form appears to have been created on a typewriter and as the district court noted, it contains nothing to indicate it is an official prison document and it contains typographical errors. A reasonable inference from the appearance of this form is that it was not a prison form provided by Smith, but rather one created by Ray. This inference becomes stronger when the Certificate of Service form is placed next to some of the letters typed by Ray which the district court also admitted into evidence and which are included as Appendices B and C. (For instance, note the use of "[]" instead of the more appropriate "()" in all of the documents.) Before the district court, Ray attempted to overcome the inference that he had created the Certificate of Service form by tendering a document he had received from the New Lisbon, Wisconsin prison (not from the CCA, as the court states). Opinion at 1013-14. This New Lisbon form, reprinted as Appendix D, also has several *1025 typographical errors and has no official prison heading. But its font and appearance differ significantly from the Certificate of Service form. And a reasonable fact-finder could infer that this form could not be created on a typewriter by a prisoner (given the font and the use of differing font sizes — some large and some small), while the Certificate of Service form could have been.

. The court responds by first stating this is a minor inconsistency and then quoting Anderson, Opinion at 1013. But, as discussed above, Anderson is quoted out of context, see supra at 1023 n. 4, and while it is a minor inconsistency, it adds to the other inferences supporting the district court's factual finding that Ray’s testimony is incredible. The court also notes “it makes no difference who technically filled out that form, so long as it demonstrates that Ray had asked Ms. Smith to mail out his motion.” Opinion at 1013-14. It is true that it wouldn't matter who filled out the form if it were truly given to Ray by Smith in response to his request to mail out the motion. But that Ray’s story changed does support an inference that he is lying when he claimed that Smith had given him that form.

. The court responds that without knowing how Diamondback was configured, this is pure speculation. Opinion at 1013. But Ray testified that when he approached Smith to give her the post-conviction motion, he had to wait because she had to take another prisoner "somewhere in the institution.” Based on this testimony, it is reasonable to infer that Smith could have likewise taken Ray to the central mailbox or mailroom.

. Besides working in the library and thus knowing the process for making copies, Ray also testified that Librarian Martin was not there on the day he brought the forms to the library — only Officer Nedbal was, and he put the paperwork in a basket.

. That Librarian Martin might talk to Ray about the copy request if he handed it to her *1030 personally is reasonable to infer given the interest she had taken in Ray’s case. She had called Ray down to the library from his housing unit to show him this court’s decision on "LexisNexis.” Another time, she had printed off a “bio” and the Facebook page for Ray's pro bono attorney and had given them to Ray.

. The court’s response: This evidence “is simply insufficient to jump to the conclusion that the receipt must therefore not exist.’’ Opinion at 1015. But Ray’s failure to ever mention the supposed Privileged Correspondence Receipt through years of litigation and the fact that his first mention of the form came only after this court held that his constitutional rights had been violated, creates a very reasonable inference that there was no such receipt in the first instance. This is not jumping to conclusions but using inferential reasoning from the evidence presented. See United States v. An Article of Device, 731 F.2d 1253, 1262 (7th Cir.1984) (“[T]he reasoning process normally begins with known facts which form the basis for inferred facts from which further inferences can be drawn. So long as the finder of fact is reasonably certain of a preliminary inference, it is not unreasonable to use that inference as the basis for further reasoning.”) (internal quotation omitted); Wisconsin Memorial Park Co. v. C.I.R., 255 F.2d 751, 753 (7th Cir.1958) (“Frequently the ultimate issue is resolved as the result of drawing inferences from the evidence received during the trial. Trust in inference is simply the belief that if there is a firm basis for the starting point the derived judgment is acceptable. The difference between speculation and inference lies in the substantiality of the evidence constituting the premise. Inductive reasoning claims the premises constitute some evidence for the conclusions and in law we speak in terms of the probability and likelihood that the premises buttress the conclusions.”) The court’s response also wrongly considers this fact in isolation, without reference to the several other facts which similarly created an inference that there never was a Privileged Correspondence Receipt.

. The court concludes that it is not unusual that Ray would attempt to track down the Privileged Correspondence Receipt himself, rather than elicit help from his attorney, stating "attorney-client communication is neither quick nor easy when the client is in prison and can be transferred at any time with little notice if any to the attorney, further delaying communication." Opinion at 1015. That explanation might make sense if Ray were attempting to gather evidence located within the same prison. But, as noted above, Ray needed to track down a prisoner who had been transferred to another prison more than three years previously. If communications between a prisoner and his attorney are neither quick nor easy, as the court infers, it is entirely reasonable to infer that an overly eager prisoner would solicit help from his attorney to track down a prisoner in another unknown prison (also subject to a transfer to a new prison), because communications between such prisoners would be even slower and more difficult.

. In April 2004, Ray was transferred from Diamondback to Green Bay and then in May 2005 from Green Bay to Dodge; followed by a transfer from Dodge to Columbia and then in February 2006, from Columbia to New Lisbon. Other than Diamondback, the other prisons were all located in Wisconsin.

. The court admits that this conclusion is "not without force,” but then says that "unfortunately for the state, it did not actually produce any evidence to support it.” Opinion at 1015. However, this conclusion is proven by Ray’s testimony. Specifically, as detailed above, Ray testified that once the Seventh Circuit's opinion came down in April, he “started trying to reach out trying to find the inmate who was transferred from the institution with my receipt.” Thus, according to Ray's own testimony, he neither had the purported Privileged Correspondence Receipt form on April 1, nor knew the location of the prisoner who supposedly had it. And then Ray claimed he sent that form for copying on Sunday, April 18, 2010. Thus, under Ray’s own version of events, as he testified to at the evidentiary hearing, the Privileged Correspondence Receipt form was retrieved within eighteen days. It is more than reasonable to infer from the sheer implausibility of this timing that Ray made the whole thing up, especially in light of the delay and difficulty prisoners face when trying to communicate with their own attorneys, as the court itself infers. See Opinion at 1014-15.

. The court states that "[i]t is not implausible that Ray would obtain a working knowledge of habeas in two months, especially after the need for such knowledge took on increased urgency when he learned that his state motion was never filed.” Opinion at 1015. While it might be plausible that Ray obtained working knowledge of habeas law in two months, it is equally plausible to infer that Ray had that knowledge in October of 2006 when he wrote the letter to the state court. And given the totality of the evidence in this case indicating that Ray concocted the entire story about giving the state post-conviction motion to Smith, this inference was more than reasonable.

. There was also no need for Ray to foresee this court's holding that the mailbox rule applied to a state post-conviction motion because Ray wasn’t relying on that theory but on the theory of equitable tolling. In this regard, the court is also wrong to say: "But Ray does not argue that he diligently followed up with the state court during the two years that passed from the time he allegedly gave Ms. Smith his motion to the time he filed his second, supplemental motion.” Opinion at 1017. Actually, though, Ray did argue that he had been diligent. In the affidavit he filed along with his pro se habeas petition, Ray stressed that he had written Smith on June 1, 2004, September 9, 2004, and June 15, 2005, and then again after he learned his state court motion had not been filed; he also added that he had then also written the prison warden. Ray then concluded that he "need only show that an 'extraordinary circumstances’ (sic) beyond control of prisoner for application of equitable tolling to obtain the necessary federal habeas review and he demonstrated due diligence in trying to rectify the matter.” It was only after counsel was appointed that the theory of equitable tolling was abandoned. But equitable tolling was Ray’s theory back in October 2006 when he sent the letter to the state court inquiring on the status of his post-conviction motion. This also explains why Ray would bother to send a letter to Smith and the warden after he "learned” that the state court had not received his letter — to bolster his claim of diligence.

. In support of his Motion for Protective Order, Ray also submitted an undated affidavit, which argued that there were "extraordinary circumstances” beyond control of prisoner for application of equitable tolling to obtain the necessary federal habeas review. This affidavit also illustrated Ray’s knowledge of the tolling principle.

. Not only does Allen support the conclusion that it is reasonable to infer that Ray never gave Smith a state post-conviction motion from the fact that he didn’t inquire on the filing for more than two years, the court's own reasoning demonstrates that this is a reasonable inference. In explaining why a prisoner might mail a state post-conviction motion from Oklahoma to a Wisconsin court, even though he knew he was being transferred to Wisconsin, the court reasons that a normal prisoner would not delay filing “such a critical motion (and consequently, delay his potential release from prison), for an indefinite period of time,....” Opinion at 1016. Similarly, it is reasonable to infer "a normal prisoner” would not delay inquiring on such a critical motion for more than two years.

. The court characterizes Ray’s failure to notify the state court of his prison transfers as "Ray’s shortcomings as a pro se litigant” Opinion at 1014, which is “simply insufficient to jump to the conclusion that the receipt must therefore not exist.” Opinion at 1015. But under Ray's version of things, he was concerned enough about the status of his motion to ask other prisoners what to do. And it is more than reasonable to infer from that fact that even a pro se litigant would at that point contact the court to notify the court of his prison transfers — not as a matter of civil procedure, but to assure that he received no *1036 tice of what was happening to the motion. Likewise, it is reasonable to infer that Ray did not contact the court, even to notify it of his transfers, because he had never filed a motion with the court.

. In both his letter to the warden and his fourth supposed letter to Smith, Ray stated that he had given Smith the postconviction motion on April 29, 2004. In all of the other documents, and in his testimony before the district court, Ray stated he had given Smith the motion on April 27, 2004.

. Grepke v. General Elec. Co., 280 F.2d 508, 511-12 (7th Cir.1960) (quoting Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946)) (" 'It is no answer to say that the jury’s verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court’s function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.” ’.)